## In re McCRORY STORES CORPORATION.

District Court, S. D. New York.

Sept. 30, 1935.

Szold & Brandwen, of New York City, for common stockholders' protective committee.

Chadbourne, Hunt, Jaeckel & Brown, of New York City (Howard H. Brown and Alfred H. Phillips, both of New York City, of counsel), for preferred stockholders' committee.

Sullivan & Cromwell, of New York City (Wilbur L. Cummings and De Lano Andrews, both of New York City, of counsel), for United Stores Corporation.

Breed, Abbott & Morgan, of New York City (Charles H. Tuttle, of New York City, of counsel), for creditors advisory committee of McCrory Stores Corporation.

Beekman, Bogue, Leake, Stephens & Black, of New York City, for common stockholders' committee.

Herman L. Weisman, of New York City, for independent debentureholders' committee of McCrory Stores Corporation.

268

Pleasants & Sperry, of New York City (Samuel A. Pleasants, of New York City, of counsel), for Walker and others, trustees.

Cotton, Franklin, Wright & Gordon, of New York City (James D. Wise and Daniel James, both of New York City, of counsel), for Southeastern Investment Trust, Inc.

PATTERSON, District Judge.

The McCrory Stores Corporation operated a large number of retail stores. It filed a petition in bankruptcy on January 14, 1933, since which time the business has been conducted by the Irving Trust Company, first as receiver and later as trustee. On July 5, 1934, the company filed a petition for reorganization. In due course a plan of reorganization was proposed. Objections to the plan were interposed, and the matter was sent to a special master to hear and report. The master has taken voluminous testimony and has reported that in his opinion the plan discriminates unfairly in favor of one of the creditors, the United Stores Corporation. The case is here on the master's report.

The parties interested in the estate are holders of debentures in the amount of $4,552,000; merchandise and other general creditors in the amount of $3,200,000; the United Stores Corporation, as assignee of numerous landlords' claims, filed for $29,000,000 and said by those advocating the plan to have an allowable value of at least $7,000,000; holders of preferred stock of $5,000,000 par value; and holders of 443,496 shares of common stock without par value. The plan has the support of nearly all the merchandise creditors, who lay stress on the importance of a speedy reorganization. It has the support also of the greater part of the debenture holders, the United, and most of the preferred stockholders. Opinion of common stockholders is divided, the larger part being in opposition.

Under the proposed plan, merchandise and other general creditors are to receive full payment of their claims in cash, without interest; debenture holders have the option to take payment in full in cash without interest, or to take new debentures of the same face amount together with shares of common stock, the debentures being underwritten by responsible bankers; holders of preferred stock will take new preferred stock share for share, without back dividends, but with the dividend rate for the future raised ½ per cent.; holders of common stock will have ⅔ of a share of new common for each share of old, with the right to subscribe to one share of new common at $6.50.

The United is to turn in the landlords' claims at a figure of $3,130,966, said to represent cost, and made up of the following: Aggregate price paid to the assigning landlords in cash $2,733,710; commission to Hedden $215,000; fees of engineers and lawyers $100,000; other expenses $18,983; interest $63,273. For $2,453,498 of this cost the United is to receive 444,840 shares of new common, being 398,148 shares at the rate of $5.40 a share and 46,692 shares at the rate of $6.50 a share. The balance of $677,468 is to be paid to the United in cash. The United is also to underwrite without charge the offering of the new common shares to the common stockholders at $6.50 a share.

Under such a plan, recapitalization will be $4,552,000 debentures, $5,000,000 preferred stock, and 1,200,000 shares of common stock. The company will have adequate working capital, and from present indications should earn at the rate of 52 cents a share on the new common stock. The master found the plan to be feasible. I am of the same opinion.

The proof indicates that the price of $6.50 a share for the new common, both for subscription by the old stockholders and for conversion of landlords' claims into stock, is a fair and reasonable figure. The objection that the United should not receive any stock in place of its present claims, no matter on what basis, is too sweeping. In the general run of reorganizations, whether in equity receivership or under the new act, creditors relinquish claims and take new stock. It does not appear that any other group of creditors wants stock instead of the cash provided for them in the plan. And it is plain that if a sound reorganization is to be accomplished, a large number of new common shares must be issued, either for sale to bring in new cash or to discharge old claims, or for both purposes. But in behalf of common stockholders, the point of pressure is that under this plan the United is to receive, in new common stock and in cash, an amount out of proportion to the value of the claims that it now holds against the debtor, and that consequently the plan dicriminates unfairly in favor of the United and against the holders of common stock. Whether the plan is offensive in this particular is the only substantial issue presented.

■ If the figure of $6.50 for the new common shares is a fair one, the United stands to make a profit of $137,962 (being $1.10 a share on the 398,148 shares it is to get at $5.40 a share) on its investment in landlords' claims. The justification for this profit, says the United, is that, wholly aside from the underwriting which the United will bear without charge, the landlords' claims have a provable and allowable value of at least $6,000,000, an amount double what it is to receive for the claims. While the claims have not yet been allowed, the proof warrants a finding that in the hands of the original landlords they would have an allowable value of between $6,000,000 and $7,000,000. But I am of opinion that in the hands of the United the claims have an allowable value against the debtor for only what the United paid the landlords for them, together with reasonable expense in acquiring them, and this because of the circumstances under which the claims were acquired.

■ By evidence quite undisputed, the United, having bought in the open market a large amount of debentures and preferred stock, enlisted Hedden's services for the acquisition of landlords' claims against the debtor. Those claims were large in number and in amount and were widely scattered, and all parties who took an active interest in the debtor's affairs recognized that these claims were the crucial element in the situation. Hedden, after doing considerable preliminary work toward corralling the claims, saw fit to become a director of the debtor company, going on the board as a representative of the United, which was a large holder of preferred stock. Although he ceased active work with the landlords for the time being, there can be no doubt that his service as a director was incidental to the task of getting landlords' claims for the United. He served as director for scarcely a month, but in that time information came to him as to what had theretofore been achieved in the way of settling landlords' claims by a Chicago group working under the debtor's directions. Those settlements were contingent on reorganization and did not involve the payment of money to the landlords. Immediately on his resignation as director he resumed active work for the United and purchased for cash practically all of the landlords' claims. The inference is a fair one that the information relative to settlements which he had obtained while a director was of value to him in acquiring the claims for the United; how much value I cannot say. And it is plain that to a certain extent he or the United was in competition with the debtor which was still making efforts, however futile, toward settling landlords' claims. Under ordinary conditions a director may purchase claims against his corporation at a discount and enforce them for their full amount. Seymour v. Spring Forest Cemetery Association, 144 N. Y. 333, 39 N. E. 365, 26 L. R. A. 859; Glenwood Mfg. Co. v. Syme, 109 Wis. 355, 85 N. W. 432; Fletcher on Corporations, § 2289. But the case is different where the corporation is insolvent and is itself in the field to settle the claims. A director who acquires claims under such circumstances may enforce them for no more than the cost of acquisition. Hedden then was inhibited from making a profit by acquiring claims against the debtor at a discount straightway after resignation and enforcing them at a greater amount. The United is under a like inhibition and must be deemed to hold the claims in trust for the debtor. It may enforce them for no more than it paid the landlords for them, together with a reasonable allowance for the expense involved in acquiring them. A constructive trustee is entitled to his necessary expenses within reasonable bounds. Ludington v. Patton, 111 Wis. 208, 86 N. W. 571. See, also, Loos v. Wilkinson, 113 N. Y. 485, 500, 21 N. E. 392, 4 L. R. A. 353, 10 Am. St. Rep. 495; Wolcott v. Commercial Investment Trust, 7 F. Supp. 809, 812 (D. C. N. Y.).

It is true that if some one with money had not appeared on the scene and reduced the scattered claims of landlords to a single control, reorganization of the debtor would have been a most difficult task. It is also true that the present plan of reorganization is vastly more favorable to creditors and stockholders than the plan to which the debtor was then committed under its contract with the Chicago group. It may well be that the creditors and stockholders are better off because of the United's activities in the situation. These matters, however, have no legal significance.

■ The opponents of the plan appeal to the "scrutiny clause" in section 77B (b) of the Bankruptcy Act (11 USCA § 207 (b) as an independent ground of holding the United down to bare cost. The clause in question is the one at the end of the sentence dealing with landlords' claims:

270

"Provided, That the court shall scrutinize the circumstances of an assignment of future rent claims and the amount of the consideration paid for such assignment in determining the amount of damages allowed assignee hereunder." The argument is that the "scrutiny clause" establishes a new rule of substantive law, that under the act assignees of rent claims are not to have the rights of their assignors. I am of the view that the clause does not go that far. If Congress had intended that the claim of the assignee should be restricted to what he had paid for the claim, it would have been simple to say so. Moreover, on such a construction a scrutiny of the "circumstances" of an assignment would be superfluous; the only inquiry would be as to the "amount" paid. Proper effect is given to the "scrutiny clause" by holding that the circumstances of the assignment and the amount paid by the assignee shall be of evidentiary force in deciding how much the claim is really worth. The clause may have also been intended as a caution or reminder to the courts to take pains to determine whether settled principles of equity may not disable an assignee of such a claim from enforcing the claim for more than the amount he paid for it, an instance being this very case.

■ For the reasons outlined, the plan is objectionable in that the claims held by the United are to be turned in at a figure above the allowable value of the claims, which is the cost of acquisition. This objection is reflected in the rate of $5.40 for the greater part of the stock, as against $6.50, and also in the amount of additional expenses deemed by the United to represent part of its cost. In my opinion, such expenses at reasonable figures should not exceed the sum of $150,000. I am mindful that part of the United's contribution under the plan is the underwriting of the new common stock without extra charge, but the excess of what it is to get in stock and cash over its allowable claims is too large to be absorbed by a fair and reasonable charge for the underwriting risk.

The present plan cannot stand. The report of the special master will be confirmed, and the plan disapproved on the ground that it discriminates unfairly in favor of the United Stores Corporation. The ensuing delay which the merchandise creditors and holders of debentures are anxious to avoid is regrettable, but such anxiety, however natural, cannot control the disposition of the matter.